## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **BRENDA J. WILSON,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:05-CV-007-Y** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF SOCIAL SECURITY** | § | |
| **DEFENDANT.** | § | |

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

## FINDINGS AND CONCLUSIONS

### A.      STATEMENT OF THE CASE

Plaintiff Brenda J. Wilson brings this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of the Social Security Administration denying her claim for supplemental security income or SSI benefits under Title XVI of the Social Security Act. Wilson applied for SSI benefits on August 17, 2001, alleging she has been disabled since June 1, 1993.[1] (Tr. 304).

---

[1] SSI payments are not payable for periods before an SSI application is filed, regardless of the actual onset date of disability. (Tr. 13). *See* 20 C.F.R. § 416.335.

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 1**

After the Social Security Administration denied her application for benefits both initially and on reconsideration, Wilson requested a hearing before an administrative law judge (the "ALJ"). ALJ Ward D. King held a hearing on March 17, 2003, which Wilson attended without representation, and issued an unfavorable decision on May 12, 2003. (Tr. 64, 262). However, the Appeals Council vacated that decision and remanded the case to the ALJ for further development. (Tr. 41). ALJ King held a second hearing on May 11, 2004 in Fort Worth, Texas. (Tr. 289). Wilson was represented by counsel during the hearing. On June 25, 2004, the ALJ issued another unfavorable determination, finding that Wilson was not disabled or entitled to SSI benefits because she was capable of performing work existing in significant numbers in the national economy. (Tr. 13-25). The Appeals Council denied Plaintiff's request for review of her case, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 5).

B.      STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is severe if it has such minimal effect on the individual that it would

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 2

not be expected to interfere with the individual's ability to work. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any  work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work. *Id.* A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 3

mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.     ISSUES

    1.     Whether the decision contains an irreconcilable conflict with respect to Wilson's physical impairments.

    2.     Whether the assessment of Wilson's residual functional capacity (RFC) is supported by substantial evidence.

    3.     Whether the assessment of Wilson's credibility is supported by substantial evidence.

D.     ADMINISTRATIVE RECORD

    1.     Medical History

Wilson underwent a consultative examination with internist Pankaj Patel, M.D., on December 18, 2001. (Tr. 180).  Wilson reported that she fractured her pelvis and right hip in a car accident in 1993, and complained of intermittent hip pain that was aggravated by walking and standing.  She had not undergone surgery or any significant treatment for her injury, and was not seeing a doctor on a regular basis.  She used over-the-counter pain medications occasionally.  She estimated that she could walk about five blocks.  She reported that she could stand for hours, but standing in a certain position was painful.  She was able to climb stairs, squat, and bend.  (Tr. 180). She also complained of bipolar disorder, anemia, knee pain and low back pain, but indicated that

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 4**

she could perform household activities without difficulty.  (Tr. 180).

On examination, Wilson exhibited mild tenderness across her low back, but no focal point tenderness over her lumbar spine.  (Tr. 181).  Her gait and station were assessed as normal, she was able to get on and off the examination table without difficulty, and she was able to walk on her heels and toes.  (Tr. 182).  She had mild tenderness over her right hip, but range of motion in her hip was within normal limits and produced minimal pain.  Range of motion in her back was within normal limits, and straight leg-raising tests were negative.  Wilson also exhibited normal range of motion in her extremities.  Strength testing measured 5/5, and her sensation and reflexes were normal.  (Tr. 182).  Patel assessed chronic hip pain with a history of fracture, but no neurological signs or symptoms; polyarthralgia; and a history of bipolar disorder.  Patel opined that Wilson could sit for long hours, stand for moderate amounts of time, walk five blocks, and lift thirty pounds.  (Tr. 182).

Wilson also attended a psychological evaluation with Laurel Jones, M.D., in December 2001.  (Tr. 185).  She complained of problems with depression since her car accident in 1993.  In 1996, Wilson's father died, and Wilson was hospitalized for one month because of visual hallucinations and thoughts that people were after her.  She alleged that someone had given her angel dust at the time.  Wilson reported that she had been diagnosed with bipolar disorder in 1998 and was given medication, but she discontinued treatment after six months because she was feeling better.  (Tr. 185).

Wilson advised that she had recurring episodes of depression alternating with days of feeling happy.  She often felt tired.  (Tr. 185).  She denied having hallucinations, delusions, or current suicidal ideations, but she sometimes thought that people wanted to hurt her.  She reported having

problems with anger management, and said that she hit walls and threw things when angered. (Tr. 186). She admitted using crack cocaine and marijuana in the past, but no longer used illicit drugs.

Wilson's mood was depressed during the evaluation, but she was alert and oriented. Her thoughts were generally coherent, logical, and relevant. (Tr. 187). Jones assessed Wilson's memory and judgment as good. Wilson reported that she lived with her three children. She cleaned her house, cooked, shopped, and handled her finances. (Tr. 188). Wilson demonstrated a fair level of concentration during the examination. Jones diagnosed bipolar disorder, and assessed a Global Assessment of Functioning (GAF) score of 50.[2] (Tr. 189). Wilson's prognosis was fair to guarded without treatment.

In March 2002, Wilson sought treatment from the local Mental Health and Mental Retardation center (MHMR) for her bipolar disorder. (Tr. 246). The evaluator found that Wilson's intellectual functioning, thought processes, mood, and response to anxiety and stress were within normal limits. Testing indicated mild hostility and mild feelings of guilt, but no other symptoms. She was assigned a GAF score of 80.[3] (Tr. 246-55). She did not meet the MHMR criteria for services and was referred to the county hospital system for assistance.

Wilson underwent a second consultative psychiatric evaluation with John Harris in May 2002. (Tr. 191). She complained of racing thoughts, concentration and memory problems,

---

[2] A GAF score is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning." AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994)(DSM-IV). *See Boyd v. Apfel*, 239 F.3d 698, 700 n.2 (5th Cir. 2001). A GAF score of 41-50 reflects serious symptoms or any serious impairment in social, occupational or school functioning. *Id*. at 34.

[3] A GAF score of 80 reflects transient and expectable reactions to psychosocial stressors and no more than slight impairment in functioning. *Id*.

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 6

hyperactivity, irritability, and crying spells. She repeatedly asked Harris what his name was during the examination. (Tr. 191). Wilson reported being hospitalized in 1996 for a suicide attempt, and claimed that she attempted suicide in the 1980s. She was not taking any psychiatric medications, but had taken several medications in the past and found them to be ineffective. (Tr. 191-92). Wilson said that she had been fired for being verbally abusive and argumentative with supervisors, and had not worked since 1992. Her current income consisted of SSI payments received by two of her children. She resided with her three children and her mother. (Tr. 192). She stated that she had never used illicit drugs and was only a mild social drinker. (Tr. 193).

On evaluation, Wilson was moderately to severely depressed and labile. Her attitude and general behavior were moderately to severely irritable and agitated. (Tr. 193). She tended to look around the room distractedly, and she talked loudly during the interview. Harris found Wilson's insight and judgment intact, and she exhibited average intellectual functioning. (Tr. 194). Harris opined that Wilson had poor social skills and moderate to severe impairment in concentration, but she performed all activities of daily living, such as cooking, cleaning, bathing, grooming, shopping, and handling her own finances. (Tr. 194). Harris assessed bipolar disorder, with a GAF score of 40-45.[4] Wilson's prognosis was poor to fair.

In October 2002, Wilson returned to MHMR with complaints of depression, mood swings, low energy, irritability, paranoia, poor memory, and instability. (Tr. 238). She denied having

---

[4] A GAF score of 40 reflects some impairment in reality testing or communication (e.g., speech that is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See* DSM-IV at 34. A GAF score of 41-50 reflects serious symptoms or any serious impairment in social, occupational or school functioning. *Id.*

hallucinations, delusions, or suicidal ideations.  The evaluator observed a malingering quality in Wilson's presentation, and noted that she was seeking disability benefits.  (Tr. 245). Her intellectual functioning and thought processes were normal, with moderate impairment in her mood and in her response to anxiety and stress.  Testing showed Wilson was suspicious, with moderate levels of hostility, excitement and grandiosity.  She exhibited mild levels of depression and anxiety.  (Tr. 242). Wilson was diagnosed with bipolar disorder and assigned a GAF score of 50.  She was given a secondary diagnosis of borderline personality disorder, not otherwise specified.  (Tr. 237).

Wilson saw a physician in March 2003.  She reported that she had diabetes, hypertension, arthritis, and a history of a cerebrovascular accident.  (Tr. 207).  Radiographic studies of her right hip showed severe osteoarthritis with minimal joint space narrowing and post-traumatic changes, but no acute bony abnormality.  (Tr. 206).  Wilson was given nonsteroid anti-inflammatory medication.  (Tr. 203).

In March 2003, Wilson told her MHMR psychiatrist that she became angry when she was working and people told her what to do.  (Tr. 235).  She complained of poor energy, sleep disturbances, poor concentration, and easy distractibility, with elevated moods occurring for a few hours every two days.  (Tr. 235).  She was cooperative, alert and oriented, with a normal attention span.  She had  no memory problems, but her judgment was considered mildly impaired based on her report of a recent fight with a neighbor.  (Tr. 234).

During a check-up in April 2003, Wilson rated her overall symptoms as 2 on a scale of 10, and the clinical rating of her symptoms was also 2 out of 10.  Her overall functioning was assessed as 5 out of 10, reflecting moderate impairment.  (Tr. 226-27).  In June, Wilson reported that her

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 8**

medication was somewhat helpful in stabilizing her mood, but she felt stressed by family problems. She was anxious and mildly irritable. Her medication was increased. (Tr. 223). In August 2003, Wilson rated her symptoms as 5 on a scale of 10. She reported doing okay, although she sometimes felt sad. (Tr. 217). She reported that she did not trust people. She was cooperative and calm during the interview, and her speech and thought content were assessed as normal. Wilson said she liked her current medication regimen. (Tr. 217). During a follow-up visit in October, Wilson reported more depression and stress after her boyfriend left her for another woman. She was also having financial problems. Wilson was anxious and irritable, but denied any suicidal ideations. Her psychiatrist increased her medication to address her mood instability. (Tr. 214).

Wilson submitted to a consultative psychological evaluation in February 2004 with Daniel Altman. (Tr. 255). Altman was a doctoral candidate being supervised by Raymond Finn, Ph.D. Wilson reported that her primary problem was an inability to get along with other people, (Tr. 255), and a bipolar disorder that interfered with her employment potential. She said she had a hard time understanding instructions and was irritable and argumentative with her supervisors, which had resulted in her termination. Wilson's current medications consisted of Trileptal prescribed by her psychiatrist at MHMR and naproxen prescribed by her primary care physician.

Wilson reported some difficulty grooming herself, which she attributed to her arthritis. Wilson reported that she was able to cook, but her sister helped her with shopping and finances because she was unable to handle her finances and could not calculate correct change. (Tr. 255). Wilson's daily activities included reading the Bible, watching television, and completing word-find puzzles. Wilson said that she did not have a good relationship with her family, but she

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 9**

communicated with them on a daily basis.  She resided with her three children.  One of her children is mentally retarded and another child has a seizure disorder.  She admitted that she intentionally did not eat well while pregnant with her third child because she did not want the baby, who weighed less than four pounds at birth.  She reported having a poor relationship with people in authority, and she disliked being told what to do.  She preferred to be by herself.  (Tr. 256).

Wilson quit school in the ninth grade.  She had worked for two employers, but neither job lasted more than two months.  Wilson reported that she had difficulty completing tasks because she did not understand instructions well, and she complained of a reduced ability to deal with stress. Stress made her irritable, and she reported being fired from both of her jobs after she became irritated with her supervisors.  (Tr. 256).

Altman described Wilson as defensive and somewhat overbearing, but she became friendlier after a tearful episode during the evaluation. (Tr. 257). Wilson exhibited some flight of ideas, and her abstract thinking was considered inadequate.  She had considered a suicide attempt in 1996, and she said that she continued to have occasional suicidal ideations.  She denied having any phobias, obsessions, or hallucinations.  Altman noted that Wilson was irritable, suspicious, and unstable, and she accused Altman of keeping information from her and trying to trick her with his questions.  (Tr. 257).  Wilson demonstrated a low-average level of intelligence, and her processing speed was slow. Her memory was somewhat intact, but Wilson was mildly distractible.  Wilson was unable to spell the word "world" forward or backward, nor could she complete a countdown from twenty correctly. Her judgment was considered inadequate based on her answers to three different scenarios and her reported attempt to sabotage her pregnancy.  Altman diagnosed bipolar disorder with a GAF score

of 55.[5] (Tr. 257). Altman assigned a poor prognosis. Although medication could control symptoms of bipolar disorder, Altman opined that Wilson's problems with people in authority could affect her compliance with treatment. (Tr. 258).

Altman's supervising psychologist, Finn, signed a medical source statement addressing Wilson's ability to perform work-related mental activities. Wilson was found markedly impaired in her ability to understand and remember instructions; make judgments on simple work-related decisions; interact appropriately with the public, coworkers, and supervisors; and respond appropriately to work pressures in a usual work setting. (Tr. 259-60). Marked impairment was defined as an ability to function that was severely limited, but not precluded. Finn rated Wilson as moderately impaired in her ability to carry out short, simple instructions and respond appropriately to changes in a routine work setting. Moderate impairment was defined as moderate limitation in a given area, but the individual is considered capable of functioning satisfactorily. (Tr. 259).

2.      Administrative Hearing

Wilson was born March 16, 1966, and testified that she had three children, ages 9, 14, and 18. (Tr. 293, 304). She quit school in the ninth grade, (Tr. 302), and she last worked in 1992. (Tr. 293, 302). She testified that she had difficulty with employment because she was easily angered, and she did not like to listen to others when she was upset. (Tr. 293).

Wilson testified that she had arthritis pain in her lower extremities. (Tr. 294). Although she used naproxen as prescribed by her physician, the medication provided no relief. (Tr. 294). She also

---

[5] A GAF score of 51 to 60 reflects moderate symptoms or moderate impairment in functioning, DSM-IV at 34.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 11**

took medication for her bipolar disorder, and saw a psychiatrist at MHMR every three months. Wilson testified that some days she was happy and some days she was depressed. Wilson had never obtained a driver's license, and generally relied on public transportation or her sister to take her places. (Tr. 296).

Vocational expert Todd Harden also testified during the hearing. The ALJ asked Harden to identify work available for a person limited to jobs requiring a reasoning development level of one through three as defined by the Dictionary of Occupational Titles and further limited by a need for only superficial public contact. Harden identified the following occupations:

- shirt presser, with 50,000 jobs available nationally and 4,000 in Texas;

- housekeeper, with 259,000 jobs available nationally and 19,000 in Texas; and

-  laundry folder, with 25,000 jobs available nationally and 2,000 in Texas.

(Tr. 298). Harden testified that a person with an eighth-grade education would be able to perform these jobs. (Tr. 302). In response to questions from Wilson's counsel, Harden testified that the availability of these jobs would be affected if the worker had severe concentration deficits. (Tr. 300).

3.    ALJ Determination

The ALJ found that Wilson had not engaged in substantial gainful activity since her alleged onset date, and further found that the medical evidence established the existence of the following impairments: osteoarthritis of Wilson's right hip with post-traumatic changes; mild anemia; a lipid disorder; bipolar disorder; mild traumatic brain injury; and an unspecified personality disorder. (Tr.

24).  Although he concluded that Wilson had a severe combination of impairments, the ALJ found that Wilson had no impairments meeting or equaling the criteria of a listed impairment.  (Tr. 24).

The ALJ found that Wilson retained the residual functional capacity (RFC) for the full range of work, except she required work with a reasoning development level of 1-3, as defined in the Dictionary of Occupational Titles, and was limited to no more than superficial public contact.  (Tr. 24).  Wilson had no past relevant work.  Relying on vocational expert testimony, the ALJ concluded that Wilson was capable of making an adjustment to work existing in significant numbers in the national economy.  (Tr. 24).  Accordingly, Wilson was not considered disabled or eligible for SSI benefits.  (Tr. 24-25).

E.    DISCUSSION

1.    Conflicting Administrative Findings

Wilson contends that the ALJ's determination at Step 2 of the sequential evaluation process that she has severe physical impairments conflicts with his determination at Step 4 that she can perform the full exertional range of work.  She claims that the ALJ, in failing to identify any work-related restrictions attributable to her physical impairments, essentially found that she had no severe physical impairments, but did so without citing the Fifth Circuit's opinion in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), or the severity standard set out in *Stone*.

Wilson fails to demonstrate irreconcilable conflict or error in the ALJ's decision that would justify remand.  Without discussion, the ALJ found that Wilson's combination of impairments were severe for purposes of the disability evaluation process and proceeded to the next step in the process.  (Tr. 14).  To the extent the ALJ should have provided additional discussion at Step Two, Wilson

**Findings, Conclusions and Recommendation of the United States Magistrate Judge–Page 13**

cannot demonstrate harm because the ALJ adequately review her physical impairments in addressing the issue of Wilson's residual functional capacity (RFC) at Step Four.   The ALJ reviewed Wilson's subjective complaints, the objective consultative examination findings, and Wilson's minimal treatment history before concluding that Wilson retained the RFC for a full range of exertional activity.  (Tr. 14-15).  Substantial evidence supports the ALJ's assessment of no physical work-related restrictions.[6]

Wilson's assertions that the ALJ treated her physical impairments as de facto non-severe impairments and circumvented Fifth Circuit case law in his decision are no more availing.  Fifth Circuit case law defines an impairment as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work.  *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000).   The court will assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to *Stone* or another opinion of the same effect, or by an express statement that the ALJ or Appeals Council is using the construction the Fifth Circuit has imposed for what constitutes a severe impairment under 20 C.F.R. § 404.1520(c).  *Loza*, 219 F.3d at 393; *Stone*, 752 F.2d  at 1106.

The ALJ did not cite *Stone* or its progeny, nor did he state that he was using the severity standard as set out in *Stone*, but any error is harmless.  In *Stone*, the court of appeals was concerned that the administration's definition of severity was being used to systematically deny benefits

---

[6] The state agency medical consultants who reviewed Wilson's application both initially and on reconsideration both found that Wilson's physical impairments were non-severe and imposed no exertional restrictions.  (Tr. 141-48).

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 14

without consideration of the remaining steps despite the presence of impairments that presented more than a slight abnormality. *Stone*, 752 F.2d at 1103-05. *See also Loza*, 219 F.3d at 391. But concerns of premature disposition of a disability claim are not applicable in Wilson's case. The ALJ did not deny Wilson's application at Step 2 of the sequential evaluation process. Instead, he gave her the benefit of any doubt and considered all of her impairments as he proceeded through the remaining steps in the process to conclude at Step Five that Wilson was not disabled.

Wilson's situation is comparable to the facts presented in *Chaparro v. Bowen*, 815 F.2d 1008 (5th Cir. 1987). In *Chaparro*, the claimant argued that the ALJ presumptively applied the wrong standard because he had not cited the *Stone* decision. The Fifth Circuit rejected this argument for two reasons. The first ground was waiver because Chaparro had not presented his argument to the district court. *Id.* at 1011. The second ground was relevance because the case had not turned on a finding of severity, which the ALJ had apparently found, but on Chaparro's ability to return to his past relevant work. *Id.* Wilson's argument is similarly irrelevant to the disposition of her own disability application.

Wilson has not demonstrated that the ALJ's failure to cite *Stone* or its severity standard undermines the Commissioner's decision. Substantial evidence supports the ALJ's determination that Wilson retained the RFC for the full exertional range of work activity.

2.      Mental Residual Functional Capacity

Wilson asserts that the ALJ's assessment of her mental RFC for the time period after January 17, 2002 through the date of the administrative decision is unsupported by substantial evidence, particularly any expert medical opinion evidence. She observes that the ALJ rejected the GAF

scores and other medical opinions provided by the consultative examiners, and instead used the evaluations prepared by state agency medical consultants as support for his determination that Wilson retained the RFC for a significant range of work.   (Tr. 22-23).

State agency medical and psychological consultants are members of the teams that make the disability determinations at the initial and reconsideration levels.   20 C.F.R. § 416.927(f)(1). Findings of fact made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairments are treated as expert opinion evidence from non-examining sources at the administrative hearing and Appeals Council levels of administrative review.   20 C.F.R. § 416.927(f); SOCIAL SECURITY RULING 96-6p.

State agency physician Margaret Meyer, M.D., initially reviewed Wilson's records on January 17, 2002 and assessed a severe mental impairment, but determined that Wilson was capable of understanding, remembering and carrying out simple instructions, interacting appropriately with coworkers and supervisors, and adapting to routine work changes.   (Tr. 149, 163-65).   On reconsideration in June 2002, state agency psychologist M. Chappuis, Ph.D., determined that Wilson had no severe mental impairment, and accordingly, no assessment of her capacity for work-related mental activities was deemed necessary.   (Tr. 127).

Wilson urges that the ALJ's determination is not supported by the record, at least as it pertains to her condition after January 2002, because the state agency medical consultants issued their opinions without the benefit of later evidence.   She selects January 2002 as the pivotal date, rather than June 2002 because the ALJ found a severe mental impairment compatible with Meyer's findings, while  Chappuis found no severe impairment.

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–**Page 16**

Wilson asserts that the ALJ rejected the medical opinions relevant to her RFC after 2002, and without that evidence, the ALJ's own assessment of her condition after January 2002 is a matter of "rank conjecture."  She cites the Fifth Circuit's opinion in *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), to support the proposition that medical reports unaccompanied by interpretative expert opinion do not constitute substantial evidence to support the ALJ's RFC findings.

In *Ripley*, the Fifth Circuit reviewed the ALJ's duty to fully and fairly develop the record and noted that the ALJ should usually request a medical source statement describing the types of work a claimant remains capable of performing.  *Id.* at 557.  But the Fifth Circuit also noted that the absence of such a statement does not, in and of itself, render the record incomplete.  *Id.*  When no such statement has been provided, the inquiry focuses on whether substantial evidence nonetheless is present in the existing record.  *Id.*  The court is to scrutinize the record as a whole when determining whether substantial evidence supports the administrative decision.  *See generally Greenspan v. Shalala,* 38 F.3d 232, 240 (5th Cir.1994).

It is undisputed that Wilson suffered from bipolar disorder.  But the ALJ also had before him the objective findings of the consulting psychiatrists, Wilson's treatment history at MHMR that generally reflected no more than moderate functional limitations,  and her own testimony about her daily activities. (Tr. 17-21).  The ALJ did not rely solely on the state agency physicians' opinions, and he adequately explained the weight he was giving to each consultative evaluation of record.  He observed that Wilson's allegations about her mental status had been inconsistent and not credible, and opined that she was exaggerating her condition during some of her evaluations.  (Tr .20).  The ALJ ultimately concluded that she could work if the work required no more than superficial contact

with the public due to her poor social skills and the work was limited to tasks requiring lower reasoning skills to accommodate her limited education and some concentration and memory deficits. He specifically declined to limit her contact with coworkers and supervisors, and observed that there was no evidence of an attempt to get along with coworkers or supervisors in more than a decade. (Tr. 21-22).

Contrary to Wilson's assertions, the lack of a medical source statement to support the ALJ's assessment of her RFC does not warrant disturbing the Commissioner's decision. The administrative record contains substantial evidence supporting the ALJ's determination that Wilson retained the capacity for a modified range of work-related mental activities.

3.     Credibility

The ALJ found Wilson's subjective allegations of pain and other symptoms were not credible because they were inconsistent and out of proportion when compared with the remaining evidence. He noted that Wilson had not sought significant medical treatment despite her complaints of debilitating pain, and referred to her poor work history and six SSI applications as evidence of a lack of motivation to work.  (Tr. 15, 21).

Wilson asserts that the ALJ's credibility determination is unsupported by substantial evidence because the administrative transcript does not contain copies of her five previous SSI applications.[7]  Wilson suggests that the ALJ was either mistaken about her previous applications

_____

[7]  Wilson raises this issue in her reply brief. Wilson previously urged in a motion to remand that the transcript was incomplete because several exhibits were missing, particularly jurisdictional documents.  Her motion was denied after the Commissioner filed a supplemental transcript with the missing jurisdictional documents. According to the List of Exhibits included at the front of the administrative transcript, no copies of previous SSI filings were admitted as specific numbered exhibits; therefore, Wilson's complaint will be treated as an evidentiary

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 18**

or erred in taking notice of extra-record evidence.  Her submission of  two hypothetical situations, without providing legal or factual support for either situation, presents no basis for reversing the Commissioner's decision.

The law does not prohibit an agency from relying on data in its files or on public information in rendering a decision.  *See Kaneb Energy Co. v. Federal Energy Regulatory Comm'n*,  814 F.2d 1083, 1086 (5th Cir. 1987); *Air Prods. & Chems., Inc. v. Federal Energy Regulatory Comm'n*, 650 F.2d 687, 697 (5th Cir. 1981).  On the contrary, an administrative agency acts  appropriately upon the record presented and such matters as properly may receive its attention through official notice.  *United States. v. Pierce Auto Freight Lines,* 327 U.S. 515, 529-530, 66 S.Ct. 687, 695 (1946).  Courts allow agencies wide latitude in taking official notice of a variety of facts.  *See Rivera-Cruz v. I.N.S.*,  948 F.2d 962, 966 (5th Cir.1991)(approving INS taking official notice of change in a country's political leadership).  The Administrative Procedure Act also recognizes an agency's right to rest its decision on official notice of a material fact not appearing in the evidence of record, but grants a party, upon timely request, the opportunity to show the contrary. 5 U.S.C. § 556(e).

The administrative record does not indicate that Wilson voiced her complaint about the ALJ's consideration of previous SSI applications in her request for review with the Appeals Council, which would have been the more timely approach.  Moreover, the mere fact that the determining body has looked beyond the record proper does not invalidate its action unless substantial prejudice is shown as a result. *Pierce Auto*, 327 U.S. at 530, 66 S.Ct. at 695.  Wilson does not demonstrate that

---

point, rather than a complaint of an incomplete administrative record.  To the extent Wilson's reply brief can be construed as a renewed motion for remand, that motion should be found without merit.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 19**

the ALJ took official notice of inaccurate facts, even if he did not include copies of Wilson's previous applications. Wilson provides the court with no basis for prohibiting the Commissioner or the ALJ from taking official or administrative notice of Social Security Administration records, and she further fails to establish substantial prejudice or error to justify disturbing the Commissioner's decision.

<u>RECOMMENDATION</u>

It is recommended that the Commissioner's decision be affirmed. To the extent Plaintiff re-urges her motion for remand based on an incomplete administrative transcript, her motion should be denied.

<u>NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT</u>

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until March 8, 2006. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest

**<u>Findings, Conclusions and Recommendation of
the United States Magistrate Judge</u>–Page 20**

injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until March 8, 2006 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED FEBRUARY 15, 2006.


_____/s/   Charles Bleil_____
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE